UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH HUBER BREWING CO., INC.,       )
                                      )
                    Plaintiff,        )     No. 05 C 2783
                                      )
        v.                            )     Judge Mark Filip
                                      )
PAMADO, INC., d/b/a CENTRAL           )
BEVERAGE COMPANY,                     )
                                      )
                    Defendant.        )

## MEMORANDUM OPINION AND ORDER

Joseph Huber Brewing Co. Inc. ("Plaintiff" or "Huber") filed a complaint in the United States District Court, Western District of Wisconsin on March 7, 2005, against Pamado, Inc., d/b/a Central Beverage Company ("Defendant," "Pamado," or "Central Beverage"). (D.E. 17.)[1] Subject matter jurisdiction was grounded on diversity of citizenship. (*Id.* ¶ 5.) The case was subsequently transferred to this Court, and the case is now before the Court on Huber's Motion To Compel Arbitration And To Stay Pending Arbitration. (D.E. 41.) For the reasons set forth below, the motion is respectfully denied.

---

[1] The various docket entries in this case are designated "D.E. __."

1

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Huber is a Wisconsin corporation in the business of brewing beer. (D.E. 40 ("Amended

Complaint") ¶ 1.) In December 2000, Huber entered into a written Wholesale Beer Distribution

Agreement ("Distribution Agreement") with Central Distributing Company ("Central

Distributing"). (*See* D.E. 42, Ex. B.) The Distribution Agreement contains an arbitration clause,

which provides that:

> Any and all disputes arising out of or in connection with the interpretation,
> performance or non-performance of this Agreement or any and all disputes
> arising out of or in connection with transactions in any way related to this
> Agreement (including, but not limited to, the validity, scope, and
> enforceability of this arbitration provision, or disputes under rights granted
> pursuant to the statutes of the state in which Distributor is licensed) shall
> be finally and completely resolved by arbitration pursuant to the arbitration
> laws of the United States of America as codified in Title 9 of the United
> States Code § 1-14, under the Rules of Commercial Arbitration of the
> American Arbitration Association. The arbitration shall be held in
> Madison, Wisconsin.

(*Id.*, Ex. B ¶ 17.)

Huber's contractual relationship with Central Distributing apparently proceeded without

noteworthy occurrence until November 1, 2002, when Donna Spagnola, seemingly the CFO of

Central Distributing, wrote to Steve Preston, Vice President of Huber, about the proposed

transfer of certain beer distribution rights owned by Central Distributing. (*See id.*, Ex. C.) The

letter states that "effective with the sale of certain distribution rights of Central Distributing

Company, Bruce Ruzgis intends to transfer his interest in the Huber brands to his fellow partners

---

[2] The following facts are taken from Huber's Amended Complaint (D.E. 40), the exhibits
and affidavits attached to its memorandum in support of its motion to compel arbitration and to
stay pending arbitration (D.E. 42, Exs.), as well as from exhibits and affidavits attached to
Pamado's response to Huber's motion. (D.E. 43.)

and three key managers, Mark Muench, Patrick Savaiano and Donna Spagnola." (*Id.*, Ex. C.) In addition, the letter indicates that "Mssrs. Muench, Savaiano and Spagnola have a combined 45 years of experience with Central Distributing and have been key to its financial, sales and operational success. They plan to continue this success with Central Distributing Company's successor business." (*Id.*, Ex. C.) The letter goes on to say that "through Ms. Spagnola's ownership interests and spousal stock ownership interest of Mssrs. Muench and Savaiano, the successor company will also qualify as a women minority owned business, opening up new avenues for business pursuits that were previously unavailable to Central Distributing Company." (*Id.*, Ex. C.)

Mr. Preston responded to Ms. Spagnola's letter on November 12, 2002 and requested additional information regarding the proposed transfer. (*Id.*, Ex. D.) Mr. Preston's letter includes the statement that "we will need to execute a new distributor contract if you remain our distributor." (*Id.*, Ex. D.)

On December 13, 2002, Ms. Spagnola sent a letter to Huber enclosing the requested information about the transfer of the Huber distribution rights. (*Id.*, Ex. E.) The letter states that Ms. Spagnola, Mr. Muench and Mr. Saviano, the "three key managers" of Central Distributing, had a "combined 15% interest in Central Distributing Company" and that "[t]hat interest was redeemed for our full and complete interest in the new company." (*Id.*, Ex. E.) The transfer of assets and redemption of rights discussed in the Spagnola-Preston correspondence was one of a series of transactions that would ultimately result in the sale of all of Central Distributing's assets and its dissolution.

In this regard, some background information concerning Central Distributing's ownership

3

structure and management is appropriate for contextual purposes. Central Distributing was an Illinois general partnership with two partners, Central Chicago Management Corporation ("CCMC") and Quatro Amigos, L.L.C. ("Quatro Amigos"). (D.E. 42, Ex. II, Aff. of Donna Spagnola ("Spagnola Aff.") ¶¶ 5, 6.) CCMC owned 70 percent of Central Distributing, and Quatro Amigos owned the remaining 30 percent. (*Id.* ¶ 6.) Mr. Bruce Ruzgis was a 100 percent shareholder of CCMC and a 51 percent owner of Quatro Amigos. (*Id.* ¶ 7.) Ms. Spagnola, Mr. Muench and Mr. Saviano were minority owners of Quatro Amigos (collectively, the "Minority Shareholders"); they each had a 16 1/3 percent ownership interest in Quatro Amigos, which computed to a five percent ownership interest in Central Distributing. (*Id.*) Mr. Ruzgis, who was the "President" of Central Distributing, gave the three Minority Shareholders their interests in Quatro Amigos during 2000 as a bonus/employee incentive. (*Id.*)

In terms of the management of Central Distributing, Mr. Ruzgis, as super-majority shareholder and president, was responsible for (a) large-scale business decisions, (b) strategic planning, (c) legal decisions and contractual decisions, and he otherwise had control of Central Distributing. (Spagnola Aff. ¶ 8.) Ms. Spagnola held the position of Vice President of Finance, Mr. Muench was the Vice President of Sales, and Mr. Saviano was the Vice President of Operations. (*Id.*) The record reflects that, in contrast to Mr. Ruzgis and his authority, the three vice presidents had more limited day-to-day operational responsibilities. (*Id.*) By way of illustration, Ms. Spagnola was responsible for daily accounting functions, Mr. Muench was responsible for day-to-day sales management, and Mr. Saviano ensured customer orders were delivered. (*Id.*) None of the three Minority Shareholders was a director or the equivalent of Central Distributing. (*Id.*)

Prior to September 20, 2002, Mr. Ruzgis informed the Minority Shareholders that he had been approached by Chicago Beverage Systems, L.L.C. ("Chicago Beverage"), a distributor competitor, about Chicago Beverage's purchase of certain distribution rights and other assets of Central Distributing. (*Id.* ¶ 9.) Chicago Beverage wanted to purchase the right to distribute approximately 80 percent of the beer brands distributed by Central Distributing. (*Id.*) At about the same time, Mr. Ruzgis proposed a sale of Central Distributing's remaining assets to a different company, or transferring the remaining Central Distributing assets (upon obtaining the required supplier consent) to the Minority Shareholders, or to their nominee. (*Id.*)

Pursuant to these discussions, on or about September 20, 2002, Central Distributing and Ms. Spagnola and Mssrs. Muench and Saviano entered into a Transfer Agreement ("Transfer Agreement"). (*Id.* ¶ 10; *see* D.E. 42, Ex. II(a).) Under the Transfer Agreement, if Mr. Ruzgis entered into an asset sale agreement with Chicago Beverage, certain assets that were not included in the contemplated asset sale to Chicago Beverage would be transferred to the Minority Shareholders as a complete redemption of their entire fifteen percent interest in Central Distributing. (D.E. 42, Ex. II(a).)

The asset sale between Central Distributing and Chicago Beverage apparently did take place. As a consequence, on or about November 8, 2002, Central Distributing, Mr. Ruzgis, and the Minority Shareholders entered into a Redemption Agreement ("Redemption Agreement"). (Spagnola Aff. ¶ 11; D.E. 42, Ex. II(b).) On November 8, 2002, Ms. Spagnola, Mr. Saviano and his wife, and Mr. Muench and his wife, incorporated Pamado. (Spagnola Aff. ¶ 2.) Thereafter, pursuant to the Redemption Agreement, the assets listed in the exhibit to the Redemption Agreement and $150,000 in cash were transferred to Pamado (as the nominee of the Minority

Shareholders of Quatro Amigos) as a complete redemption of the Minority Shareholders' rights, titles, and interests in Central Distributing. (D.E. 42, Ex. II(b).) Also on or about November 8, 2002, Quatro Amigos, Ms. Spagnola and Mssrs. Saviano and Muench entered into an "Agreement Regarding Distribution of Interests." (Spagnola Aff. ¶ 12; D.E. 42, Ex. II(c).) Under that agreement, Quatro Amigos distributed to each of the Minority Shareholders their interests in the company. (*Id.*) About a month later, Central Distributing, CCMC, and Quatro Amigos were dissolved. (D.E. 35 (Aff. of Joseph P. Mulhern, Exs. 4-9).)

Ms. Spagnola became the President of Pamado. (Spagnola Aff. ¶ 2.) Because Pamado was to distribute only roughly 20 percent of the beer products previously distributed by Central Distributing, Pamado entered into a lease for less space with Central Distributing's prior landlord, effective January 1, 2003. (*Id.* ¶ 13.) Pursuant to the new lease, Pamado occupied approximately one-third of the warehouse space previously occupied by Central Distributing. (*Id.*) In addition, Pamado downsized the former Central Distributing fleet of trucks by selling approximately one-half of the fleet. (*Id.*) Also, following its formation, Pamado entered into new agreements with suppliers that had previously supplied Central Distributing with products. (*Id.*)

Pamado went through the process of hiring employees, many of whom were former Central Distributing employees, and the newly-hired Pamado employees lost any seniority that they had at Central Distributing. (*Id.* ¶ 14.) As an organization, Pamado was substantially smaller than Central Distributing: Pamado had 35 employees compared to Central Distributing's roughly 80. (*Id.*) Pamado also started a new 401(k) plan and opened a new bank account. (*Id.*) Pamado's annual revenues were approximately $12 million, less than half of the total annual

6

revenue of $35 to $40 million of Central Distributing prior to its dissolution. (*Id.*)

Returning to the relationship between Huber and the newly formed entity of Pamado, despite the correspondence between Ms. Spagnola and Mr. Preston, Huber never formally approved the proposed transfer in writing, and Huber and Pamado did not sign a new distribution agreement. (*See* D.E. 42, Ex. I, Aff. of Steve Preston, June 2005 ("Preston Aff., June 2005") ¶ 7.) According to Mr. Preston's June 2005 affidavit, business operations between Pamado and Huber remained the same as they had been between Huber and Central Distributing; specifically, beer orders, billing and payment procedures stayed the same. (*See id.* ¶ 8.)

At some point the relationship between Huber and Pamado soured. Mr. Preston's December 2005 affidavit states that during the Summer of 2004, the dispute between Huber and Pamado escalated. (D.E. 42, Ex. III, Aff. of Steve Preston, December 2005 ("Preston Aff. December 2005") ¶ 5.) At that time, Mr. Joe Gladis, Huber's Director for Sales and Marketing, was the Huber representative responsible for servicing the Pamado account. (*Id.* ¶ 4.) Mr. Gladis and other individuals reviewed the files at Huber's main business offices, which are in Monroe, Wisconsin, and at Huber's office in Aurora, Illinois, and looked for, among other things, documents pertaining to the relationship between Huber and Pamado. (*Id.* ¶¶ 3-5.) The Distribution Agreement was not found at that time. (*Id.* ¶ 5.)

Huber filed suit on March 7, 2005 against Pamado in the United States District Court, Western District of Wisconsin. (D.E. 17.) Huber's Complaint sought a declaratory judgment regarding the fair market value of Pamado's business with Huber and damages for breach of contract, along with costs and disbursements as allowed by law. (*Id.* ¶¶ 6-14.) In the Complaint, Huber alleged that it "entered into an oral and implied distribution agreement" with Pamado. (*Id.*

¶ 7.)

Behind the scenes of the litigation, on April 14, 2005, another document review took place at the Huber offices. (Preston Aff. December 2005 ¶ 7.) The Distribution Agreement was not found at either Huber's Monroe office or its Aurora office. (*Id.*) Mr. Preston then looked in his office in Madison, Wisconsin and found the Distribution Agreement in a file in a box under his desk. (*Id.*) Mr. Preston accounts for the belated discovery of the Distribution Agreement in the following way:

> I performed the search of my Madison office because, while I had previously forgotten about the existence of the Distribution Agreement, as the case went to litigation I seemed to recall that a Distribution Agreement existed and was concerned that it had not been located. Because of my sense that a Distribution Agreement was in existence, I wanted to be sure I took every step possible to confirm whether or not one existed and, if it did, to locate it.

> The Distribution Agreement contains certain financial information which is not normally included in Huber's Distribution Agreements. Huber generally takes steps to maintain the confidentiality of Huber and its distributor's financial information. It is possible that this is why the Distribution Agreement was not kept in its normal location at the Monroe offices but, instead, remained with me at my Madison office.

(*Id.* ¶¶ 8, 9.) Huber did not immediately bring the existence of the Distribution Agreement, and its arbitration clause, to the attention of the court in the Western District of Wisconsin.

Pamado filed a motion to transfer venue, and on May 5, 2005, Judge Shabaz granted the motion to transfer venue to the Northern District of Illinois. (D.E. 43, Ex. C.) On May 6, 2005, Huber filed an on-line demand for arbitration with the American Arbitration Association ("AAA"), requesting Madison, Wisconsin as the hearing locale. (D.E. 27, Ex. A.) In its arbitration demand, Huber stated that it "entered into an oral and implied distribution agreement with Central Beverage." (*Id.*, Ex. A.) Concurrently, Huber filed a motion to stay pending

arbitration with the Western District of Wisconsin, which Judge Shabaz dismissed as moot on May 9, 2005. (D.E. 19-3.)

On May 10, 2005, Pamado was contacted by the AAA case manager assigned to the Huber arbitration demand. (*See* D.E. 27, Ex. F.) In one of Pamado's counsel's letters responding to the case manager, Pamado asserted that "[t]here is no basis for arbitration" between the parties because "[t]here is no written contract between the parties, and no agreement by Pamado to arbitrate." (*Id.*, Ex. F.) Given the lack of basis for arbitration, and the fact that the parties' dispute was being litigated in the Northern District of Illinois, Pamado asserted that Huber should withdraw its demand for arbitration. (*Id.*, Ex. F.)

Huber then filed a motion with this Court to stay its proceedings pending arbitration on June 22, 2005. (D.E. 23.) Huber filed an amended motion to compel arbitration and to stay pending arbitration on July 11, 2005. (D.E. 27.)

After reviewing the briefing related to Huber's motion, the Court determined that additional factual information would be necessary to determine the arbitrability of the dispute. On November 23, 2005, the Court held a status hearing in the case, at which time the parties agreed to a discovery/evidentiary plan. The Court accepted their joint preference to be able to rebrief the issues after completing appropriate factual investigation, agreeing that such a process would facilitate focused analysis of the salient issues.

After the parties completed fact discovery, Huber filed an Amended Complaint (D.E. 40) and refiled its Motion To Compel Arbitration And To Stay Pending Arbitration. (D.E. 41.) Huber's Amended Complaint brings its contract claims based on the written Distribution Agreement. (Amended Complaint ¶ 7.) Huber asserts that Pamado is required to arbitrate the

9

present matter because it "succeeded to the written contractual obligations of its predecessor, Central Distributing Company," and "the contract between Central Distributing and Huber contained a valid and enforceable mandatory arbitration clause." (D.E. 42 at 2.)

The case is before the Court on Huber's renewed Motion to Compel Arbitration and To Stay Proceedings Pending Arbitration. Based on the additional factual information produced by the parties, and the new and renewed arguments they have advanced, the Court concludes that Huber's motion must be respectfully denied.

## JURISDICTION

Pursuant to 28 U.S.C. § 1332, the Court has subject matter jurisdiction over the instant case because complete diversity of citizenship exists between Huber (a Wisconsin corporation with its principal place of business in Monroe, Wisconsin) and Pamado (an Illinois corporation with its principal place of business in Broadview, Illinois), and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs. (Amended Complaint ¶¶ 1-3.) Subject matter jurisdiction in the present matter is based upon diversity of citizenship. (*See id.* ¶¶ 4-5.)

## LEGAL STANDARDS AND CHOICE OF LAW

Huber's motion to stay these proceedings pending arbitration is brought pursuant to Section 3 of the Federal Arbitration Act ("FAA"), which provides, in its entirety, that:

> [i]f any suit or proceeding be brought in any of the courts of the United States
> upon any issue referable to arbitration under an agreement in writing for such
> arbitration, the court in which such suit is pending, upon being satisfied that the
> issue involved in such suit or proceeding is referable to arbitration under such an
> agreement, shall on application of one of the parties stay the trial of the action
> until such arbitration has been had in accordance with the terms of the agreement,
> providing the applicant for the stay is not in default in proceeding with such

arbitration.

9 U.S.C. § 3. A district court "'must grant the requested stay where two conditions are satisfied:

(1) the issue is one which is referable to arbitration under an agreement in writing for such

arbitration, and (2) the party applying for the stay is not in default in proceeding with such

arbitration.'" *Sims v. Montell Chrysler, Inc.*, 317 F. Supp. 2d 838, 840 (N.D. Ill. 2004) (quoting

*C. Itoh & Co. (Am.) Inc. v. The Jordan Int'l Co.*, 552 F.2d 1228, 1231 (7th Cir. 1977)).

Huber's motion to compel arbitration is brought pursuant to Section 4 of the FAA, which

provides that:

> [a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate
> under a written agreement for arbitration may petition any United States district
> court which, save for such agreement, would have jurisdiction under Title 28, in a
> civil action . . . of the subject matter of a suit arising out of the controversy
> between the parties, for an order directing that such arbitration proceed in the
> manner provided for in such agreement . . . The court shall hear the parties, and
> upon being satisfied that the making of the agreement for arbitration or the failure
> to comply therewith is not in issue, the court shall make an order directing the
> parties to proceed to arbitration in accordance with the terms of the agreement . . .
> . If the making of the arbitration agreement or the failure, neglect, or refusal to
> perform the same be in issue, the court shall proceed summarily to the trial
> thereof.

9 U.S.C. § 4. Precedent teaches that "[a]rbitration is contractual by nature—a party cannot be

required to submit to arbitration any dispute which he has not agreed so to submit." *Zurich*

*American Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (internal punctuation

and citations omitted); *accord, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943

(1995) (collecting cases).

For choice of law, Huber and Pamado agreed in the prior stage of this litigation before

Judge Shabaz that the Illinois Beer Industry Fair Dealing Act, 815 ILCS 720 *et seq.*, as amended,

11

("BIFDA") governed Huber's legal claims against Pamado. (As the parties also acknowledge, arbitration under the FAA is not precluded by the forum selection clause of BIFDA. *See* 815 ILCS 720/9(1); *accord Stawski Distrib. Co., Inc. v. Browary Zywiec S.A.*, 349 F.3d 1023, 1026 (7th Cir. 2003) (concluding that the requirement under BIFDA to apply Illinois substantive law did not foreclose international arbitration).) In this regard, Judge Shabaz considered Illinois law in granting the venue transfer. (*See* D.E. 28, Ex. C at 3.) The briefs that have been filed principally, if not nearly exclusively, rely on Illinois law and related Seventh Circuit law, and no one makes any issue of applying Illinois law. Accordingly, the Court will continue to apply Illinois law, where appropriate (in the interests of completeness, some of the arbitration/waiver issues are governed by federal precedent) to the case *sub judice*. *Accord, e.g., Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995); *Harter v. Iowa Grain Co.*, 220 F.3d 544, 559 n.13 (7th Cir. 2000).

## DISCUSSION

I.   Huber Did Not Judicially Admit That This Dispute Was Governed By An Oral
     Agreement

First, Pamado argues that "Huber's allegation in its [original] Complaint about the existence of 'an oral and implied distribution agreement' constitutes a judicial admission, which precludes Huber from now claiming Pamado is bound to the written agreement between Huber and Central Distributing." (D.E. 43 at 9.) The Court respectfully disagrees and finds that Huber's prior allegation in its original Complaint about an oral and implied agreement between the parties does not constitute a judicial admission.

"Judicial admissions are formal concessions in the pleadings, or stipulations by the party

or its counsel, that are binding upon the party making them." *Help at Home, Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001) (internal quotation marks and citation omitted). As the Seventh Circuit acknowledged in *Help at Home*, however, "there may be instances in which statements made in superseded pleadings that had been filed early in the litigation should not be characterized properly as admissions." *Id.* (citing *Moriarty v. Larry G. Lewis Funeral Directors Ltd.*, 150 F.3d 773, 777-78 (7th Cir. 1998)); *see also Eastern Natural Gas Corp. v. Aluminum Co. of America*, 126 F.3d 996, 1001 (7th Cir. 1997) (discussing admissibility of prior pleadings as evidentiary admissions, rather than as "conclusive judicial admissions") (citation omitted). In *Moriarty*, the defendants contended that the plaintiff had pleaded itself out of court based on allegations made in its first amended complaint. *Id.*, 150 F.3d at 777. The Seventh Circuit rejected that contention, in light of the fact that the plaintiff had subsequently replaced the potentially-fatal allegation in its second amended complaint. *Id.* The court provided the following rationale for not characterizing the initial allegation as a binding admission:

> [l]itigants who must frame their claims before obtaining discovery often find it necessary to conform their theories to the facts as time goes on. Abandoned theories fall by the wayside. An allegation of this kind can't sensibly be called an 'admission'; it is a characterization of (or perhaps just a speculation about) what evidence unknown to the pleader may show.

*Id.* at 777-78.

Huber's original Complaint asserted that "Huber Brewing entered into an oral and implied distribution agreement with Central Beverage." (D.E. 17 ¶ 7.) After filing that complaint, Huber discovered the existence of the Distribution Agreement. (Preston Aff., December 2005 ¶¶ 8, 9.) Huber subsequently amended its complaint under Fed. R. Civ. P. 15(a)

and replaced the relevant allegation with the statement that "Huber Brewing and Central Beverage are parties to a written Distribution Agreement . . . ." (Amended Complaint ¶ 7.) Pamado has not argued that permitting amendment to the complaint under Fed. R. Civ. P. 15(a) was procedurally improper.

Thus, in the present matter, Huber has amended its allegations based on newly discovered information and has adjusted its arguments based on this revised allegation. This distinguishes Huber's situation from cases where courts have bound parties to their initial allegations. *See, e.g., Help at Home, Inc.*, 260 F.3d at 753 (characterizing as a judicial admission the party's allegation in the original complaint that the transaction was a "loan," where the same allegation was repeated in the amended complaint, and where the plaintiff did not further move to amend the complaint despite its awareness of documentation that it later relied on for its theory that the transaction was not a loan). In light of Huber's revised allegations, revised theory and plausible explanation for the revision, the Court concludes Huber's initial allegation does not constitute a judicial admission that would preclude bringing its claims based on the Distribution Agreement. *See, e.g., Moriarty*, 150 F.3d at 778 ("[A] false step early in a case does not blot out the opportunity to prevail on a claim that is sound factually and legally.").

II.     Pamado Is Not Bound To Arbitrate Under The Distribution Agreement

As discussed earlier, "[a]rbitration is contractual by nature—a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Zurich American Ins. Co.*, 417 F.3d at 687 (internal punctuation and citations omitted). As framed by the parties' briefing, then, the threshold question is whether Pamado is bound under the Distribution Agreement and, as a result, is obligated to arbitrate.

A. Pamado Did Not Agree To Assume Central Distributing's Obligations Under The Distribution Agreement

Huber's arguments that Pamado should be required to arbitrate under the terms of the Distribution Agreement are grounded in the law of corporate successor liability. "The well-settled general rule is that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation." *Vernon v. Schuster*, 688 N.E.2d 1172, 1175 (Ill. 1997) (citing *Nilsson v. Cont'l Machine Manuf. Co.*, 621 N.E.2d 1032 (Ill. App. Ct. 1993)). The general rule against successor liability applies to contractual obligations, as well as to tort liability. *See, e.g., Oxxford Clothes XX, Inc. v. Expeditors Int'l of Wash., Inc.*, 127 F.3d 574, 578-79 (7th Cir. 1997) (collecting cases); *Unit Trainship, Inc. v. Soo Line R.R. Co.*, 905 F.2d 160, 162 (7th Cir. 1990) (applying rule against successor liability to case against successor railroad involving breach of contract by predecessor railroad). There are four exceptions to this rule:

(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) when the purchaser is merely a continuation of the seller corporation; or (4) when the transaction is for the fraudulent purpose of escaping liability for the seller's obligations.

*Vernon*, 688 N.E.2d at 1175-76 (citing, among others, *Steel Co. v. Morgan Marshall Indus. Inc.*, 662 N.E.2d 595 (Ill. App. Ct. 1996)); *accord, e.g., Hernandez v. Johnson Press Corp.*, 388 N.E.2d 778, 779 (Ill. App. Ct. 1979). In the context of a case involving a contract dispute, such as the present matter, if any of the exceptions to the rule against successor liability applies, then the purchasing corporation "is required to honor and comply with the contracts and the obligations" of the selling corporation. *Gray v. Loyola Univ. of Chicago*, 652 N.E.2d 1306,

1310-11 (Ill. App. Ct. 1995) (citation omitted).

Huber contends that the first exception to the general rule against successor liability applies here, because Pamado implicitly agreed to assume the obligations of the Distribution Agreement by maintaining a business relationship in the same manner as under the Distribution Agreement. (D.E. 44 at 5.) Precedent teaches that the first exception of express or implied assumption of liability focuses in great if not exclusive part on contractual terms between the purchasing company and the selling company. *See, e.g., Myers v. Putzmeister, Inc.,* 596 N.E.2d 754, 756 (Ill. App. Ct. 1992) (finding that the first exception did not apply, and stating that the court's analysis of the assumption relationship was "governed by the express provisions of the written document which dictates the agreement between the parties."); *Green v. Firestone Tire & Rubber Co., Inc.,* 460 N.E.2d 895, 899 (Ill. App. Ct. 1984) (analyzing language of agreement). Therefore, the Court examines the written agreement(s) between Central Distributing and Pamado that effectuated the transfer of assets.

In the present matter, Pamado's attorney Mr. Mulhern indicates that there is "no per-se asset purchase and/or sale agreement" for the transfer of assets between Central Distributing and Pamado. (Mulhern Aff. ¶ 5.) However, Mr. Mulhern goes on to explain that "there are several inter-related agreements that address how Pamado came to obtain certain assets of Central Distributing Company." (*Id.*) Having reviewed the agreements provided by Pamado, the Court believes that the Transfer Agreement and the Redemption Agreement are the contracts that govern the transfer of assets between Pamado and Central Distributing. The Transfer Agreement is two pages long and consists of three terms. The applicable terms state that:

    1.   If Ruzgis concludes the negotiations with Chicago and Central enters into an

16

asset sale agreement with Chicago, then Ruzgis and the Redemption Group [Ms. Spagnola, Mr. Muench, and Mr. Saviano] agree that the assets of Central listed on Exhibit A hereto and not included in such asset sale agreement with Chicago shall be transferred to the Redemption Group as a complete redemption of the interests of the Redemption Group in Central.

2. Prior to the closing of any such asset sale to Chicago, the assets of Central listed on Exhibit A hereto and not scheduled to be sold or transferred to Chicago shall be transferred to the Redemption Group, or their nominee, as a complete redemption of their entire right, title and interest in Central.

(D.E. 42, Ex. II(a).)

The applicable term of the two-page Redemption Agreement states as follows:

1. Effective as of the morning of November 8, 2002 certain assets of Central, as listed n [sic] Exhibit A attached hereto and made a part hereof, (*i.e.*, assets not sold to Chicago) and cash in the amount of One Hundred Fifty Thousand Dollars ($150,000.00) are transferred to Pamado, Inc. ("Pamado") an Illinois corporation and the nominee of the Redemption Group, as a complete redemption of the entire right, title and interest of the Redemption Group in Central.

(D.E. 42, Ex. II(b).)

As shown above, the relevant terms in the Transfer and the Redemption Agreements do not indicate that the Minority Shareholders/Redemption Group/the eventual owners of Pamado assumed any liabilities on behalf of Central Distributing. Nor do the agreements disclaim liability on behalf of Pamado; quite simply, the issue is not addressed. To be sure, some of the authority in this area of law addresses agreements where the purchaser expressly disclaimed responsibility for the liabilities of the seller. *See, e.g., Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 812 F. Supp. 124, 127-28 (N.D. Ill. 1993) (concluding that there was no assumption of liability where the asset purchase agreement stated "[e]xcept as expressly provided herein or in Exhibits hereto attached, [purchaser] is not assuming any of [seller's] liabilities."). However, the fact that Pamado's liability is not expressly disclaimed is not determinative. Where an issue is

not addressed one way or the other in a contract, general contract interpretation principles instruct that the default position prescribed by the law typically applies. *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1425 (7th Cir. 1993). Here, that means that the purchaser does not assume the liabilities of the asset-seller—at least unless, as explored immediately below and as is not the case here, surrounding circumstances direct a different conclusion than the presumptive one. *See, e.g.*, *Vernon*, 688 N.E.2d at 1175 ("The well-settled general rule is that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation.").

In addition, review of the list of assets attached as Exhibit A to the Transfer Agreement and the Redemption Agreement reveals that the distribution rights to the products of various wholesalers, including Huber, are not included—that is, the distribution rights are not numbered among the assets transferred. (*See* D.E. 43, Ex. A at 18-20 (Transcript of November 23, 2005 status hearing) (discussing whether such rights can be legally transferred under BIFDA).) Therefore, the written agreements do not address in any way the transfer of intangible assets such as distribution rights, much less the assumption of any liabilities associated with distribution rights. In addition, evidence beyond the four corners of the agreements suggests that the distribution rights and associated liabilities were not formally transferred from Central Distributing to Pamado. Ms. Spagnola has stated that "following its formation, Pamado entered into new agreements with suppliers that had previously supplied Central Distributing with products." (Spagnola Aff. ¶ 13.)

Accordingly, because the relevant agreements do not expressly provide for the general assumption of liabilities, or for liabilities associated with intangible assets such as distribution

18

rights, and because the surrounding circumstances do not direct a different outcome, the Court concludes that the default rule in the law applies; accordingly, the Court concludes that Pamado did not agree to assume Central Distributing's contractual liability. *See, e.g., Myers*, 596 N.E.2d at 424 (stating that the "express provisions of the written document which dictates the agreement between the parties" govern on the issue of assumption of liabilities); *see also Chaveriat*, 11 F.3d at 1425 (default rule presumptively applies in the law where agreements do not address issue or suggest otherwise).

B.    Pamado Is Not a Continuation Of Central Distributing

In the alternative, Huber argues that Pamado is a continuation of Central Distributing, consistent with the third exception to the successor liability rule, and therefore Pamado is a party to the Distribution Agreement. (D.E. 44 at 5.) The Court concludes that Huber has failed to show that Pamado fits within the exception under Illinois law for a "continuation" of a business (here, a continuation of Central Distributing).

Illinois Supreme Court precedent teaches that: "[t]he continuation exception to the rule of successor corporation nonliability applies when the purchasing company is merely a continuation or reincarnation of the selling corporation. In other words, the purchasing corporation maintains the same or similar management and ownership, but merely wears different clothes." *Vernon*, 688 N.E.2d at 1176 (internal quotation marks and citations omitted; collecting authorities); *accord, e.g., Brandon v. Anesthesia & Pain Mgmt. Assocs., LTD.*, 419 F.3d 594, 599 (7th Cir. 2005). The rationale for the exception is that "if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability." *Vernon*, 688 N.E.2d at 1176 (internal quotation marks and citation omitted); *see also Chaveriat,*

19

11 F.3d at 1424 (stating that if an asset sale is "simply a corporate reorganization that leaves real ownership unchanged, the liabilities go with the assets.") (collecting Illinois authorities).

The inquiry for the continuation exception "focuses on whether the purchaser continues the *corporate entity* of the seller, not so much on whether the purchaser continues the *business operations* of the seller . . . ." *North Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 654 (7th Cir. 1998) (emphases in original); *accord, e.g., Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977). An important element in determining if there has been a continuation is "a common identity of officers, directors and stock between the selling and purchasing corporation . . . ." *Vernon*, 688 N.E.2d at 1176 (citation omitted); *accord, e.g., Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 440 (7th Cir. 1977); *Green*, 460 N.E.2d at 899 (citing *People ex. rel Donohue v. Perkins & Will Architects, Inc.*, 413 N.E.2d 29, 31-33 (Ill. App. Ct. 1980)).

In terms of additional factors for the continuation analysis, the Seventh Circuit in *North Shore Gas* surveyed the case law and found instances where courts had weighed whether there is a continuity of ownership and control; whether only one corporation exists after the transfer of assets; and whether the purchaser paid adequate consideration for the assets. *Id.*, 152 F.3d at 654. The Seventh Circuit further stated that "no single factor is determinative," and "courts take a common-sense approach when deciding whether the seller's corporate entity has continued after the sale of assets." *Id.*

Starting with the question of continuity of ownership, the fact that Central Distributing was a general partnership means that there could not be continuity of "stock" ownership *per se* between Central Distributing and Pamado. However, the Court can still consider the issue of continuity of ownership—case law instructs that rules of successor liability apply regardless of

20

the composition of the prior business entity. *See generally Firkin v. U.S. Polychemical Corp.*, 835 F. Supp. 1048, 1051 (N.D. Ill. 1993) (Zagel, J.) (citing Illinois and other state and federal cases as authority for its decision to apply corporate successor liability laws to a situation where a sole proprietorship subsequently incorporated); *accord, e.g., id.* ("Other state courts that have addressed this issue have found that the composition of the prior business entity has no bearing on the application of corporate liability laws.").

The two partners of Central Distributing, CCMC and Quatro Amigos, each owned fifty percent of the business. CCMC, was, in turn, wholly owned by Mr. Ruzgis, and Quatro Amigos was owned by Mr. Ruzgis (51%) and by the Minority Shareholders (16 1/3 % each). Therefore, the Minority Shareholders, by their ownership stakes in Quatro Amigos, owned a total of fifteen percent of Central Distributing. In the transaction between Central Distributing and Pamado, Pamado received, as the nominee of the Minority Shareholders, the Central Distributing assets not included in the asset sale to Chicago Beverage, along with $150,000 in cash, in exchange for a complete redemption of the Minority Shareholders' interest in Central Distributing. The Minority Shareholders and their spouses became the sole shareholders of Pamado. Therefore, in terms of ownership, the three Minority Shareholders held 15% of Central Distributing, and then held something less than 100% of Pamado. This minority of continuity of ownership, in the form of a stake of less than fifteen percent, does not weigh in favor of a finding of the continuation exception to Illinois's general rule. *See, e.g., Commercial Nat'l Bank v. Newtson*, 349 N.E.2d 138, 139-40 (Ill. App. Ct. 1976) (applying the general rule against corporate successor liability in situation where one shareholder owned 25% of the predecessor corporation, and after the asset transfer the same shareholder owned 40% of the successor corporation).

Although Illinois courts require continuity of ownership for the continuation exception, *see, e.g, Green*, 460 N.E.2d at 899, they have applied the continuation exception in some situations where there was less than complete identity of ownership. *See, e.g., Park v. Townson & Alexander*, 679 N.E.2d 107, 110 (Ill. App. Ct. 1997) ("We note that the continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporation."); *id.* (finding that the successor corporation that had purchased accounts payable to debtor was mere continuation of debtor and so accounts payable could be garnished, where a husband and wife had each been 50% shareholders of the debtor, and where the wife became the sole shareholder of the successor corporation).

A review of Illinois caselaw shows that a significant change in ownership between a predecessor and a successor corporation can still result in a finding of a continuation, at least where the change in ownership is accounted for by transfers between family members. *See also, e.g., Steel Co.*, 662 N.E.2d at 600-01 (concluding that there was a continuity of shareholders, "even though the shareholders were different in each corporation," where the sole shareholder of the selling corporation became the chief executive of the purchasing corporation and where his wife became 80% stockholder of the purchasing corporation). In the present matter, inter-family transfers apparently occurred between Mssrs. Muench and Saviano and their wives. However, Mr. Muench and Mr. Saviano only had ten percent of Central Distributing to transfer. Thus, even if the Court were to equate the husbands' and wives' ownership of stakes in Pamado (thereby meaning that the Minority Shareholders held 100% of Pamado), the reality would remain that only the fifteen percent ownership share of the Minority Shareholders in Central

22

Distributing would be continuous.[3] This supports the idea of the inapplicability of any continuation exception under Illinois law.

*North Shore Gas* further instructed that the question of control should go hand-in hand with the analysis of ownership. *See id.*, 152 F.3d at 655 (finding an identity of control after a company underwent a reorganization, despite the fact that the controlling shareholder's stake was reduced from 99% of the company's common stock to 35%, because 35% "was for all practical purposes . . . sufficient to ensure control . . . ."). Here, unlike the situation in *North Shore Gas*, control clearly changed hands, because Mr. Ruzgis, who controlled 85 percent of Central Distributing, received no ownership stake in Pamado and thus is not in control of the new company. (Spagnola Aff. ¶ 6.) In the present matter, therefore, the limited continuity of ownership does not equate to a continuity of control. The Court concludes, under a common sense approach, that the fact that control changed hands from Mr. Ruzgis to the Minority Shareholders and their wives strongly suggests that Central Distributing's corporate entity did not continue in Pamado or that the new corporation was simply a "a mere change in form without a significant change in substance." *Vernon*, 688 N.E.2d at 1176 (internal quotation marks and citation omitted).

In terms of the officers of the companies, there is some commonality between Central

---

[3] The idea of equating husbands' and wives' ownership interests is obviously in tension with many modern jurisprudential developments concerning property rights, and the idea is particularly awkward is a setting where, as here, property rights were apparently structured so that the new corporation would qualify as a female-owned business. Nonetheless, Illinois caselaw has looked at this issue, and the Court applies such analysis in this diversity suit. For present purposes, the salient point is that when the Court applies the analysis reflected in Illinois caselaw, even if one puts aside any issues about equating husbands' and wives' ownership interests, the analysis does not support the idea of "continuation" liability for the second business entity vis-a-vis the first.

Distributing and Pamado. Ms. Spagnola served first as the Vice President of Finance at Central Distributing and then as the president of Pamado. (Spagnola Aff. ¶¶ 2, 6.) In addition, it is undisputed that Mr. Muench went from being the Vice President of Sales at Central Distributing to being the Chief Executive Officer of Pamado, and Mr. Saviano, formerly the Vice President of Operations at Central Distributing, became the Chief Operating Officer at Pamado. (D.E. 42 at 8 & n.1.) There is no common identity of directors: Ms. Spagnola has averred that none of the Minority Shareholders was a director, or the equivalent, at Central Distributing. (*Id.* ¶ 8.) Therefore, the evidence shows the presence of some continuity of officers and no continuity of directors.

In deciding how the management factor weighs in the successor liability analysis, the Court again attempts to address corporate realities, rather than weighing the facts as abstract concepts. *See North Shore Gas*, 152 F.3d at 656. Accordingly, the Court looks not only at the fact that three management team members shifted from Central Distributing to Pamado, but also at the level of responsibility and degree of control the managers exerted at each company. The evidence suggests that the three vice presidents had operational roles at Central Distributing, and then appear to have become the strategic leaders at Pamado. The evidence also shows that Mr. Ruzgis was the strategic leader at Central Distributing and that he has no management role whatsoever at Pamado. In light of the change in managerial control, the Court concludes that this factor disfavors any application of the continuation exception to the presumptive Illinois rule against successor liability. *See, e.g.*, *Leannais*, 565 F.2d at 440 (finding that the continuation exception did not apply, and stating that "[u]nlike the situation in which a new corporation merely takes over the assets of the selling corporation under the old management, the

24

management of [the selling corporation] was not carried over to [the purchasing corporation.]");
*Myers*, 596 N.E.2d at 756-57 (concluding that neither the *de facto* merger nor the continuation exception applied where there was no common ownership between the seller and buyer, despite the continuity of middle management employees) (citing *Mahn Hung Nguyen v. Johnson Machine & Press Corp.*, 433 N.E.2d 1104, 1106-07 (Ill. App. Ct. 1982)).

Another factor courts consider is whether the selling company remains a separate, ongoing concern after the asset sale. *See, e.g.*, *North Shore Gas Co.*, 152 F.3d at 654 (stating that some courts consider whether only one corporation exists after the transfer of assets); *Travis*, 565 F.2d at 447 (applying Indiana law and taking into account in its continuation analysis the fact that the purchasing and selling corporations remained distinct entities for a week after the sale). When the selling company continues to exist as a business entity after the sale, court are more likely to conclude that the purchasing company is not merely the continuation of the selling company. *See, e.g.*, *Commercial Nat'l Bank*, 349 N.E.2d at 140 (taking into account in its continuation analysis the fact that the selling corporation retained assets in excess of $200,000 and continued in existence for a time after the sale). In the case *sub judice*, the assets were transferred from Central Distributing pursuant to the Redemption Agreement on November 8, 2002. (D.E. 42, Ex. II(b).) Central Distributing was dissolved on December 24, 2002, in accordance with Section 205/31 of the Illinois Uniform Partnership Act. (Mulhern Aff., Ex. G.) Therefore, Central Distributing remained a separate and distinct entity after the sale of assets. Given that precedent has noted the continued existence of the prior business entity for as little as a week after the asset sale—*see Travis*, 565 F.2d at 447—the fact that Central Distributing existed for over a month after the asset sale further supports a finding that Pamado was not a

"mere continuation" of the entity.

An additional factor that courts have considered in the continuation-exception analysis is whether adequate consideration was paid for the acquired assets. *North Shore Gas Co.*, 152 F.3d at 654. There has been no evidence presented suggesting that the Minority Shareholders would have been willing to accept less than adequate consideration for their stakes in Central Distributing (via their stakes in Quatro Amigos). Therefore, the Court believes that this factor supports the theory that the asset transfer was a bona fide substantive transfer subject to presumptive treatment under Illinois law.

At least one Illinois court has weighed the similarities in business operations between the predecessor and the successor companies. *See, e.g.*, *Hoppa v. Schermerhorn & Co.*, 630 N.E.2d 1042, 1046 (Ill. App. Ct. 1994) (concluding that the continuation exception applied where the buyer and the seller real estate brokers "conducted business from the same address using the same telephone number; managed the same property; employed same staff; and maintained the same bank accounts."). Contrary to the situation in *Hoppa*, in the present matter, Pamado: conducts business from the same location as Central Distributing, but with only 1/3 of the warehouse space; uses less than half of the Central Distributing fleet; employs less than half the staff of Central Distributing; and maintains a different bank account. Pamado also does not distribute the same beer brands as Central Distributing—approximately 80% of Central Distributing's distribution rights was purchased by Chicago Beverage. Therefore, the business and operations of Pamado do not reflect that it is merely a "new coat" for Central Distributing.

Finally in this regard, Huber appears to assert that the correspondence between Ms. Spagnola and Mr. Preston, in which Ms. Spagnola describes Pamado as the "successor" to

26

Central Distributing, supports applying the continuation exception. (D.E. 42 at 8.) Huber cites

no authority, nor has the Court found any, for the proposition that a layperson's representations,

made outside the context of any formal agreement, should be considered in the corporate

successor liability analysis. General federal precedent concerning a lay-witness's ability to

testify to such a legal conclusion suggests that the evidence may not be admissible at all. *See*

*Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) (collecting cases and

stating, "lay legal conclusions are inadmissible in evidence."); *accord, e.g.*, *Torres v. County of*

*Oakland*, 758 F.2d 147, 151 (6th Cir. 1985); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir.

1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony

that expresses a legal conclusion."). However, even if the correspondence is admissible, it does

not change the result. Such lay representations would appear to have little to do with the

question of whether the seller's corporate entity continued on in the purchaser, or whether the

conditions of analysis prescribed by Illinois caselaw and other precedent support application of

the continuation exception under Illinois law. Therefore, the statements in the correspondence do

not direct any conclusion that Pamado is subject to the continuation exception under Illinois law.

In conclusion, the balance of factors in this case supports applying the presumptive rule

against successor liability. There is approximately fifteen percent overlap of ownership between

Central Distributing and Pamado, and they share three officers in common. However, Mr.

Ruzgis was the supermajority owner, the sole "director," and the undisputed strategic leader of

Central Distributing, and he is not an owner of, nor does he have any management role in,

Pamado. Accordingly, both managerial and ownership control changed hands with the asset

transfer. Moreover, Central Distributing continued for over a month following the asset transfer;

27

there has been no contention that the consideration exchanged for the assets was not adequate; and Pamado's business is different in scale and composition from Central Distributing's. In light of the pertinent facts, Pamado cannot fairly be deemed a mere change in form from Central Distributing, without a significant change in substance. *Vernon*, N.E.2d at 1176; *see also Commercial Nat'l Bank*, 349 N.E.2d at 140 (directing courts to analyze whether the second business entity is simply a "reincarnation" of the first). Accordingly, the continuation exception does not apply. The Court instead applies the general rule against corporate successor liability, and so finds that Pamado is not obligated to arbitrate on such basis under the Distribution Agreement.

     C.     Pamado Is Not Equitably Estopped From Arguing That It Should Not Be Bound By The Agreement

Huber also contends, for the first time in its reply brief, that Pamado should be equitably estopped from arguing that it is not the successor to Central Distributing. (D.E. 44 at 3.) Raising an argument for the first time in a reply brief, as a matter of process, is insufficient to present an argument in a trial court. *See FTC v. World Media Brokers*, 415 F.3d 758, 766 (7th Cir. 2005) (collecting cases). However, even if Huber had raised its estoppel argument in a timely fashion and so had permitted Pamado a full and fair opportunity to respond, the argument would fail.

Precedent teaches that equitable estoppel may preclude one party from asserting a claim or defense against another party who has detrimentally altered its position in reliance on the former's misrepresentation or failure to disclose a material fact. *See Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992) (citing *Portmann v. United States*, 674 F.2d 1155, 1158 (7th Cir. 1982)). Setting aside the question of whether Ms. Spagnola's statement that Pamado was the

"successor" to Central Distributing was a misrepresentation (the word "successor" also has a number of non-legal connotations, which would not be accompanied by the implications for corporate successor liability), Huber's argument fails because the evidence suggests that it did not rely, reasonably or otherwise, on the statement.

In this regard, the Court notes that Huber in its brief cites no factual support for its bare assertion of reliance. (D.E. 44 at 4.) (The brief does not allege *detrimental* reliance, but, and with all respect, the deficiency in Huber's position on this issue is more fundamental.) Given the opportunity each side had to present the underlying facts and record materials, this lack of citation to any actual evidence also is fatal.

Furthermore, an independent review of the record suggests no detrimental reliance. After receiving the letter with Ms. Spagnola's statements about Mr. Ruzgis's interest in the Huber brands being transferred to "Central Distributing's successor business," Mr. Preston wrote back and stated that "we will need to execute a new distributor contract if you remain our distributor." (D.E. 42, Exs. C, D.) Mr. Preston's response about the need for a new contract suggests that Huber did not rely on Ms. Spagnola's representation that Pamado was a successor business, nor on any corresponding inference that the Distribution Agreement governed the future relationship between Pamado and Huber. Given Huber's explicit skepticism about whether the Distribution Agreement was applicable to Pamado, it further would not have been reasonable for it to rely on Ms. Spagnola's comments. Therefore, even if Huber had properly raised its equitable estoppel argument, it would have to be rejected.

III.     The Court Need Not Decide Whether Huber Also Waived Any Putative Right To
         Arbitrate

Pamado asserts that, even assuming *arguendo* that it was bound to arbitrate the present

dispute under the Distribution Agreement, Huber has waived its right to arbitrate. The Court

concludes it is a close question whether waiver should be found in the present matter. In light of

the Court's decision that Pamado is not bound to arbitrate under the Distribution Agreement, the

Court finds it unnecessary to rule on the question of waiver.

In analyzing the issue of waiver of the right to arbitrate arising under the FAA, the Court

follows precedent from federal courts interpreting the FAA. *See, e.g., West Shore Pipe Line Co.*

*v. Assoc. Elec. & Gas Ins. Servs. Ltd.*, 791 F. Supp. 200, 203 (N.D. Ill. 1992) (Norgle, J.). "A

contractual right to arbitrate may be waived expressly or implicitly, and a party that chooses a

judicial forum for the resolution of a dispute is presumed to have waived its right to arbitrate."

*Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) (citing *Ernst & Young*

*LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 757 (7th Cir. 2002)); *see also Welborn Clinic*

*v. Medquist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002) ("Litigating a claim is clearly inconsistent

with any perceived right to arbitration; we do not want parties to forum shop, taking a case to the

courts and then, if things go poorly there, abandoning their suit in favor of arbitration.").

However, "waiver is not lightly inferred; the strong federal policy favoring enforcement of

arbitration agreements impresses upon a party asserting waiver a 'heavy burden.'" *Williams v.*

*Katten, Muchin & Zavis*, 837 F. Supp. 1430, 1442 (N.D. Ill. 1993) (Marovich, J.) (citing *St.*

*Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 590 (7th Cir.

1990) and *Dickinson v. Heinold Secs., Inc.*, 661 F.2d 638, 641 (7th Cir. 1981)). "Although

several factors may be considered in determining waiver, diligence, or the lack thereof should weigh heavily in the decision—'did that party do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration?'" *Ernst & Young LLP*, 304 F.3d at 757 (quoting *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995)). Prejudice to the party resisting arbitration is a factor to consider in the waiver analysis, but it is not a prerequisite for finding waiver. *See, e.g., Design Benefit Plans, Inc. v. Enright*, 940 F. Supp. 200, 203 (N.D. Ill. 1996) (Reinhard, J.) (citing *St. Mary's*, 969 F.2d at 590).

In light of these standards from the precedent, it is a close call whether Huber has waived its right to arbitrate. Pamado correctly argues that "the Seventh Circuit has made clear that an election by a plaintiff to proceed before a nonarbitral tribunal is a <u>presumptive waiver</u> of the right to arbitrate." (D.E. 43 at 15 (emphasis in original) (citing *Cabinetree*, 50 F.3d at 390 and *Ernst & Young LLP*, 304 F.3d at 756).) But Seventh Circuit precedent also teaches that the presumption of waiver is "just a presumption, not an invariable rule," *Iowa Grain Co. v. Brown*, 171 F.3d 504, 509 (7th Cir. 1999), and that there are situations where the decision to invoke the judicial process "does not signify an intention to proceed in a court to the exclusion of arbitration." *Cabinetree*, 50 F.3d at 390. The *Cabinetree* opinion outlined the types of situations where courts should find exceptions to the presumption of waiver:

> There might be doubts about arbitrability, and fear that should the doubts be resolved adversely the statute of limitations might have run. Some issues might be arbitrable, and others not. The shape of the case might so alter as a result of unexpected developments during discovery or otherwise that it might become obvious that the party should be relieved from its waiver and arbitration allowed to proceed. We need not try to be exhaustive. It is enough to hold that while normally the decision to proceed in a judicial forum is a waiver of arbitration, a

variety of circumstances may make the case abnormal, and then the district court should find no waiver or should permit a previous waiver to be rescinded.

*Id.* at 391. The Seventh Circuit in *Iowa Grain* distilled the following propositions from *Cabinetree*:

> First, an important part of the district court's waiver inquiry is whether the party filing the lawsuit intended to elect a judicial forum rather than the arbitral tribunal. Second, uncertainty about the right to arbitrate is a factor that tends to undermine a finding of waiver from the mere filing of a court action. Third, even if a district court finds an initial waiver of the right to arbitrate, it is also entitled to permit that waiver to be rescinded, depending on the course the litigation takes.

*Iowa Grain Co.*, 171 F.3d at 509-10.

In the instant case, Huber elected to file suit against Pamado in district court in Wisconsin on March 7, 2005, and therefore it has presumptively waived its right to arbitrate. Nonetheless, Huber asserts that it should be relieved of any initial or presumptive waiver based on subsequent developments in the case. As discussed above, Huber's Vice President, Mr. Preston, states that on April 14, 2005, he performed a search of his Madison office and found the Distribution Agreement. (*See* Preston Aff. December 2005 ¶¶ 8, 9.) Until the discovery of the Distribution Agreement, complete with its arbitration clause, Huber would have been uncertain about its right to arbitrate its contract dispute with Pamado. *Iowa Grain Co.*, 171 F.3d at 509-10. Huber's belated discovery of the existence of the Distribution Agreement could potentially satisfy the condition established by the Seventh Circuit, namely that "an unexpected development during discovery" altered the shape of the case at hand. *Cabinetree*, 50 F.3d at 390; *accord, e.g., Iowa Grain Co.*, 171 F.3d at 509-10 (finding that plaintiff had not waived its right to arbitrate where plaintiff filed class action suit in district court and then moved for arbitration once that suit was dismissed, because the kind of class action that plaintiff sought to bring is normally unavailable

in arbitration and court interpreted plaintiff's filing of class action suit "as an effort to structure the case–change its shape, as *Cabinetree* put it–in a way that was fundamentally incompatible with arbitration.").

Huber's uncovering of the Distribution Agreement arguably distinguishes its situation from cases where courts have been at a loss to explain why the party seeking arbitration had not moved for it previously. *See Ernst & Young LLP*, 304 F.3d at 757 ("Neither the bankruptcy court nor the district court found *any reason* why Ernst & Young might not have asserted its desire to arbitrate at an earlier date.") (emphasis added). On the other hand, however, it is a fair question whether Huber's conduct in not discovering the existence of the Agreement until after filing suit qualifies as "diligence," or as "the lack thereof" for the purposes of rescinding its presumptive waiver—*i.e.*, "'did [Huber] do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration?'" *Ernst & Young LLP*, 304 F.3d at 756-57 (quoting *Cabinetree*, 50 F.3d at 391). In the present matter, once the problems between Pamado and Huber escalated in Summer 2004, Huber employees began to review their files in Huber's offices in Monroe, Wisconsin and Aurora, Illinois, looking for documents pertaining to the parties' relationship. (Preston Aff. December 2005 ¶¶ 3-5.) Those searches proved fruitless, and the Distribution Agreement did not surface until Mr. Preston searched his office in Madison, Wisconsin and found the document in a box he apparently kept under his desk.

One might expect that before filing a breach of contract suit against another party, the putative plaintiff would comprehensively explore the possibility that there was in existence a written agreement governing the parties' relationship. Searching the files at two company

33

offices, especially when it does not appear that Huber maintains many more than three offices, does not immediately impress the Court as a fulsome document review. Nor do the efforts undertaken rate particularly impressively when assessed in terms of appropriate levels of diligence—particularly given that the document at issue was not located, for example, in some remote storage facility as a result of a natural disaster such as a tornado or hurricane, but instead was found in a box under a relevant senior executive's desk. Huber's explanation regarding why the Distribution Agreement was not found in the first two places Huber employees looked (namely, that it "contain[ed] certain financial information") does not change the Court's perception that the failure to find the Distribution Agreement might well equate with a failure of appropriate diligence. *See, e.g.*, *Ernst & Young LLP*, 304 F.3d at 757 (directing a district court to analyze whether the party seeking to avoid the presumptive waiver of any arbitration rights did "'all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration'") (quoting *Cabinetree*, 50 F.3d at 391). In addition, the fact that Huber did not immediately bring the existence of the Distribution Agreement, with the relevant issue of whether the dispute should properly be arbitrated, to the attention of Judge Shabaz mitigates against finding that Huber took all reasonable steps "to make the earliest feasible determination of whether to proceed judicially or by arbitration." *Id.*

The factor of prejudice in this case does not weigh strongly for or against waiver. Huber moved for arbitration on May 6, 2005, approximately two months after it filed its suit in the Western District of Wisconsin. The relatively short duration of the delay, and the fact that Huber did not gain any advantage by having access to discovery during that time, distinguishes the present matter from cases like *St. Mary's* where the defendant actively participated in the

34

litigation for ten months before moving for arbitration. *Id.*, 969 F.2d at 590-91; *see also Williams*, 837 F. Supp. at 1443 (collecting cases where parties' delay in filing was found to be "the type of calculated delay sufficient to warrant waiver and override the federal government's strong pro-arbitration policy"). However, Pamado was forced to expend the avoidable costs (had Huber discovered the Distribution Agreement earlier) of engaging in the district court litigation, which included the successful effort of filing and supporting its motion to transfer from federal court in Wisconsin to federal court in Illinois. This not extensive prejudice, but, as stated above, prejudice is not a prerequisite for waiver. *See, e.g., Design Benefit Plans, Inc.*, 940 F. Supp. at 203.

Given the resolution of other aspects of the case, the Court is not required to decide whether Huber's belated discovery of the Distribution Agreement should properly be characterized as an unexpected development (thereby negating its earlier presumptive waiver) or instead a failure of diligence (meaning that waiver should apply). Because the Court has already determined that Pamado is not bound to arbitrate under the Distribution Agreement, the issue of waiver of any putative arbitration rights is accordingly moot.

**CONCLUSION**

For the reasons stated above, the Court respectfully denies Huber's motion to compel arbitration and to stay proceedings pending arbitration. (D.E. 41.)

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: 9/5/06